**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **FELIX HASSON** | ) | |
| ***Plaintiff,*** | ) | **Case No. 1:26-cv-00114** |
| **v.** | ) | |
| **MAXIMILLIAN KRCHMAR** | ) | |
| ***Defendant.*** | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF AUTHORITIES

### Case Law

**30 CPS, LLC v. Bd. of Managers of Cent. Park S. Med. Condo.*,
23 Misc. 3d 1024 (Sup. Ct. 2009)........ 27

*Abrams v. Dep't of Pub. Safety*,
764 F.3d 244 (2d Cir. 2014)........ 8

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970)........ 16

*Amadeo v. Zant*,
486 U.S. 214 (1988)........ 10

*Ames v. Cartier, Inc.*,
193 F. Supp. 2d 762 (S.D.N.Y. 2002)........ 17

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)........ 4, 13

*Ayissi-Etoh v. Fannie Mae*,
712 F.3d 572 (D.C. Cir. 2013)........ 10, 11

*Banks v. GM, LLC*,
81 F.4th 242 (2d Cir. 2023)........ 11, 12

*Bellamy v. House*,
2025 U.S. Dist. LEXIS 62200 (D.S.C. Apr. 1, 2025)........ 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........ 3

*Bolden-Hardge v. Office of the Cal. State Controller*,
63 F.4th 1215 (9th Cir. 2023)........ 4

**Bostock v. Clayton Cty.*,
590 U.S. 644 (2020)........ 15, 16

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993)........ 6, 23, 24

*Buon v. Spindler*,
65 F.4th 64 (2d Cir. 2023)........ 17

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)........ 4

*Canel v. Art Inst. of Chi.*,
No. 23CV 17064, 2025 U.S. Dist. LEXIS 30309 (N.D. Ill. Feb. 20, 2025) ... 7

*Celle v. Filipino Reporter Enters.*,
209 F.3d 163 (2d Cir. 2000) ... 8

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ... 19

*City of Mesquite v. Aladdin's Castle,*
455 U.S. 283 (1982) ... 22

*Cohen v. Davis*,
926 F. Supp. 399 (S.D.N.Y. 1996) ... 26

*Coward v. Town & Vill. of Harrison*,
665 F. Supp. 2d 281 (S.D.N.Y. 2009) ... 18

**De Litta v. Village of Mamaroneck*,
166 F.App'x 497 (2d Cir. 2005) ... 25

*EEOC v. WRS Infrastructure & Env't, Inc.*,
No. 09 C 4272, 2011 U.S. Dist. LEXIS 110149 (N.D. Ill. Sep. 27, 2011) ... 12

*Electra v. 59 Murray Enters.*,
987 F.3d 233 (2d Cir. 2021) ... 8

*E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*,
2019 U.S. Dist. LEXIS 76459, 2019 WL 2010523 (D.D.C. May 7, 2019) ... 19, 20

*Feder v. Bristol-Myers Squibb Co.*,
33 F. Supp. 2d 319 (S.D.N.Y. 1999) ... 17

**Fisher v. Shamburg*,
624 F.2d 156 (10th Cir. 1980) ... 24

**Frankel v. Regents of the Univ. of Cal.*,
744 F. Supp. 3d 1015 (C.D. Cal. 2024) ... 7, 20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ... 22

**Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245 (S.D.N.Y. Feb. 5, 2025) ... 7, 8

*Girard v. 94th and Fifth Avenue Corp.*,
530 F.2d 66 (2d Cir. 1976)....................................................................... 25, 26

*Graham v. Long Island R.R.*,
230 F.3d 34 (2d Cir. 2000)....................................................................... 17, 18

**Griffin v. Breckenridge*,
403 U.S. 88 (1971)................................................................................... 24

*Guilfoile v. Shields*,
913 F.3d 178 (1st Cir. 2019).................................................................... 9

*Hairston v. Royal Bldg. Prods.*,
No. 1:18CV00003, 2019 U.S. Dist. LEXIS 62936 (W.D. Va. Apr. 12, 2019)............................................................................................... 12

*Hecox v. Little*,
79 F.4th 1009 (9th Cir. 2023).................................................................. 6

*Henry v. Lucky Strike Entm't, LLC*, No. 10- CV-03682 (RRM) (MDG),
2013 U.S. Dist. LEXIS 124939 (E.D.N.Y. Sep. 1, 2013)........................... 27

*Herrmann v. Moore*,
576 F.2d 453 (2d Cir. 1978)..................................................................... 25

*In re NYSE Specialists Sec. Litig.*,
503 F.3d 89 (2d Cir. 2007)....................................................................... 4

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977)................................................................................. 20

*James v. Am. Airlines, Inc.*,
247 F. Supp. 3d 297 (E.D.N.Y. 2017)...................................................... 20, 21

*Jones v. Alfred H. Mayer Co.*,
392 U.S. 409 (1968)................................................................................. 24

*Kassner v. 2nd Ave. Delicatessen Inc.*,
496 F.3d 229 (2d Cir. 2007)..................................................................... 5

*Katzenbach v. McClung*,
379 U.S. 294 (1964)................................................................................. 16

*Kelly v. Metro-North C. R.R.*,
No. 87 Civ. 5817 (JFK), 1989 U.S. Dist. LEXIS 15025 (S.D.N.Y. Dec. 18, 1989)........................................................................................... 11, 12

*Kopmar v. Ass'n of Legal Aid Attys.*,
No. 24-CV-5158 (JPO), 2025 U.S. Dist. LEXIS 134446 (S.D.N.Y. July 15, 2025)........ 14

*Kravitz v. Purcell*,
87 F.4th 111 (2d Cir. 2023)........ 4, 5

*Landau v. Corp. of Haverford Coll.*,
780 F. Supp. 3d 548 (E.D. Pa. 2025)........ 9

*Littlejohn v. City of New York*,
795 F.3d 297 (2d Cir. 2015)........ 14

*LSO, Ltd. v. Stroh*,
205 F.3d 1146 (9th Cir. 2000)........ 20

*Mahler v. First Dakota Title Ltd. P'ship*,
931 F.3d 799 (8th Cir. 2019)........ 12

*Mandell v. Cty. of Suffolk*,
316 F.3d 368 (2d Cir. 2003)........ 17, 18

*McClung v. Katzenbach*,
233 F. Supp. 815 (N.D. Ala. 1964)........ 16

*Mian v. Donaldson, Lufkin & Jenrette Sec.*,
7 F.3d 1085 (2d Cir. 1993)........ 23

*Moini v. Wrighton*,
602 F. Supp. 3d 162 (D.D.C. 2022)........ 15

*Murtha v. Yonkers Child Care Ass'n*,
45 N.Y.2d 913 (1978)........ 26

*Ostrer v. Aronwald*,
567 F.2d 551 (2d Cir. 1977)........ 24

*Ostrowski v. Atl. Mut. Ins. Cos.*,
968 F.2d 171 (2d Cir. 1992)........ 11

*Pac. Shores Props., LLC v. City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013)........ 6

*Patterson v. McLean Credit Union*,
491 U.S. 164 (1989)........ 24

*Porter v. Dartmouth-Hitchcock Med. Ctr.*,
92 F.4th 129 (2d Cir. 2024)........ 12

*Roniger v. McCall*,
22 F. Supp. 2d 156 (S.D.N.Y. 1998)........................................................ 25

*Rose v. N.Y.C. Bd. of Educ.*,
257 F.3d 156 (2d Cir. 2001)................................................................ 11

*Saint Francis Coll. v. Al-Khazraji*,
481 U.S. 604 (1987)............................................................................ 5

**Shaare Tefila Congregation v. Cobb*,
481 U.S. 615 (1987)............................................................................ 5

*Silver v. N. Shore Univ. Hosp.*,
490 F. Supp. 2d 354 (S.D.N.Y. 2007)...................................................... 17

**Sinai v. New Eng. Tel. & Tel. Co.*,
3 F.3d 471 (1st Cir. 1993)..................................................................... 5, 9

*Singh v. Carter*,
168 F. Supp. 3d 216 (D.D.C. 2016)........................................................ 19

*Smith v. City of Jackson*,
544 U.S. 228 (2005)............................................................................ 19

*StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
158 F.4th 1 (1st Cir. 2025)..................................................................... 8, 9

**StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
165 F.4th 97 (1st Cir. 2026)................................................................... 9

*Sumrall v. Ali*,
793 F. Supp. 3d 199 (D.D.C. 2025)........................................................ 10, 11, 13, 19

*T.E. v. Pine Bush Cent. Sch. Dist.*,
58 F. Supp. 3d 332 (S.D.N.Y. 2014)........................................................ 5

*Tenemille v. Town of Ramapo*, No. 22-1715, 2025 U.S. App. LEXIS
23731, (2d Cir. Sep. 15, 2025).............................................................. 17

**Thomas v. Tops Friendly Markets*,
Civil Action No. 96-CV-1579 (RSP/GJD), 1997 U.S. Dist. LEXIS 15887
(N.D.N.Y. Oct. 8, 1997)........................................................................ 19

*Traggis v. St. Barbara's Greek Orthodox Church*,
851 F.2d 584 (2d Cir. 1988)................................................................... 24

**Turkmen v. Hasty*,
789 F.3d 218 (2d Cir. 2015)................................................................... 25, 26

*United States v. W. T. Grant Co.*,
345 U.S. 629 (1953)........................................................................ 22

*Wigginess Inc. v. Fruchtman*,
482 F. Supp. 681 (S.D.N.Y. 1979)............................................................. 17

*Woodman v. WWOR-TV, Inc.*,
411 F.3d 69 (2d Cir. 2005)........................................................................ 13

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)........................................................................ 25

**Statutes**

42 U.S.C. § 1982…………………………………………………………... 23

42 U.S.C. § 1981…………………………………………………………... 23

42 U.S.C. § 2000…………………………………………………………... 18, 19

42 U.S.C. § 1985…………………………………………………………... 23

NYCRL § 40………………………………………………………………. 27

NYCRL § 41………………………………………………………………. 27

NYCHRL § 8-107…………………………………………………………. 27

NYSHRL § 296…………………………………………………………… 27

# TABLE OF CONTENTS

INTRODUCTION………………………………………………………….. 1

SUMMARY OF FACTUAL ALLEGATIONS…………………………….. 1

STANDARD OF REVIEW…………………………………………………… 3

ARGUMENT…………………………………………………………………….. 4

I. Defendant Discriminated Against Plaintiff on the Basis of His Jewish Identity……………………………………………………………… 4

A. Zionism is a Core Component of Jewish Religion, Race, and National Origin or Otherwise a Proxy for it…………………... 4

B. Defendant's Contrary Authority on Zionism is Inapposite and Otherwise Supports Plaintiff………………………………... 7

C. Defendant Directly Discriminated Against Plaintiff on the Basis of His Jewish Identity. 9

1. Defendant Directly Discriminated Against Plaintiff by Acting on His Own Articulated Antisemitic Animus…. 9

2. Defendant Directly Discriminated Against Plaintiff by Deferring to the Antisemitic Animus of Others……… 15

D. Defendant Indirectly Discriminated Against Plaintiff on the Basis of His Jewish Identity…………………………………... 17

II. Plaintiff States Claims for All Causes of Action……………………… 18

A. Plaintiff has Standing and States a Claim under Title II of the Civil Rights Act of 1964……………………………………. 18

B. Plaintiff States Claims under The Civil Rights Act of 1866….. 23

C. Plaintiff States Claims under The Civil Rights Act of 1871 and Common Law Tortious Interference………………………… 23

D. Plaintiff States Claim under all State and Local Statutory Causes of Action………………………………………………. 27

CONCLUSION……………………………………………………………….. 27

## INTRODUCTION

Plaintiff pleads in detail that Defendant removed Plaintiff from the 2024 LMBM tournament because of Plaintiff's Zionist Jewish identity. While Plaintiff pleads Zionism is his sincerely held Jewish religious belief, inseparable from his race and national origin, Defendant requests this Court to issue a per se ruling that Zionism is solely political. Defendant asks too much of this Court too soon. First, Plaintiff's pleading of a sincerely held religious belief entitles him to special deference at this stage and can only be resolved through factfinding. Second, Defendant's own case law notes the relationship between anti-Zionism and antisemitism is contested, again a question requiring factfinding. Finally, Plaintiff presents direct evidence of discrimination, generally entitling a claimant to present his case to a jury. This Court should therefore deny Defendant's motion in full, ruling that all of Plaintiff's claims may proceed.

## SUMMARY OF FACTUAL ALLEGATIONS

Plaintiff Felix Hasson is a Jewish-American for whom Zionism, or support of Israel, is a sincerely held religious belief otherwise inseparable from his Jewish race and national origin. Compl. at ¶¶13-19, 22-23. He is also professional videogamer who plays Super Smash Brothers Ultimate ("Smash"). *Id*. at ¶5. Defendant Maximillian Krchmar is a tournament organizer ("TO") for the annual Let's Makes Big Moves ("LMBM") Smash tournament, *id*. at ¶6, held at the New Yorker Hotel. *Id*. at ¶48. LMBM souvenirs are sold at its "artist alley." *Id*. at ¶51. Plaintiff contracted to compete in the 2024 LMBM and patronize the artist alley. *Id*. at ¶¶50-51.

On December 20, 2023, LMBM participant Jonathan Mendez tweeted to Defendant several of Plaintiffs tweets professing the Zionist aspect of Plaintiff's Jewish identify (effectively identifying Plaintiff as a Jew) and otherwise innocuously commenting on Israel-Palestine. These tweets included (1) Plaintiff celebrating his time in the "settlements," Israeli communities widely

known to be homogeneously Jewish; (2) a cartoon image of an Israeli soldier with a large Israeli flag, which features the Jewish Star of David in the center of what symbolizes a Jewish prayer shawl; (3) Plaintiff, as part of a discussion on the Palestinian Smash scene, speculating about what weapons they use in the weapons-focused fighting game; (4) Plaintiff predicting Israel's significant response to the October 7 massacre; and (5) Plaintiff laughing at someone first cheering the massacre and later lamenting Israel's response. *Id*. at ¶¶20-26. Defendant mischaracterizes this last tweet as Plaintiff mocking "a Palestinian tweeting that she 'Lost everything,'" Defendant's Memorandum of Law (hereinafter "Mem.") at 14,[1] ignoring that she celebrated the worst atrocity of Jews since the Holocaust.

Mendez absurdly alleged Plaintiff's tweets exhibited violent, racial animus towards Palestinians, and he requested Plaintiff's removal from LMBM on grounds that Plaintiff is a "Zionist weasel," echoing Third Reich rhetoric of characterizing Jews as vermin. Compl. at ¶¶27-29. Per Defendant, there was a "massive amount of public support" from the LMBM community for Mendez's "Zionist weasel" post and removing Plaintiff, to which Defendant claimed he deferred. *Id*. at ¶¶34-35.

In a Facebook chat, Defendant and his fellow LMBM TOs, also recipients of Mendez's tweet, reviewed it and Defendant granted Geoffrey Tirrell permission to remove Plaintiff from LMBM. *Id*. at ¶30. Defendant later confirmed to the owner of LMBM that he ratified Tirrell's removal request, *id*. at ¶38, and had contemporaneously reviewed Plaintiffs tweets. *Id*. at ¶37. Another TO, Cyrus Gharakhanian, posted in the group chat a message from Plaintiff explaining his Jewish identity as related to Israel, noting *inter alia*: "As a Jew I have a strong allegiance to my ethnic homeland and I am very much on the side of my people during this war," "I am a Zionist and a proud supporter of the state of Israel," "I've been removed from LMBM for being a

[1] Citations to the docket are to page numbers as stamped by ECF.

'Zionist weasel'" and "Smash has nothing to do with my support for my people." *Id*. Defendant responded to Plaintiff's message about his Jewish identity—the same identity reflected in Plaintiff's tweets Defendant reviewed—with "Homie is definitely a Zionist weasel," echoing Mendez's antisemitic slur." *Id*. at ¶30. Defendant could not have known this phrase without seeing Mendez's tweet, which reposted Plaintiff's tweets expressing his Judaism. Defendant previously expressed antisemitic animus, once tweeting "You know Israel is evil when the only candidate who even dared to speak out against them was the Jewish guy who isn't bought and paid for," a reference to Bernie Sanders and an allusion to antisemitics tropes relating Jews to money and world domination. *Id*. at ¶¶31, 42. Defendant mischaracterizes this statement as mere "criticism against a foreign state," Mem. at 19, ignoring the antisemitic tropes.

Tirrell also presented Defendant with Plaintiff's additional pleas for reinstatement, which noted "a huge double standard" because, *inter alia*, Mendez, who is not Jewish, used an antisemitic slur but did not get banned. Compl. at ¶¶32, 41, 43. Defendant similarly did not ban Mohammad Farraj, who cyberbullied Plaintiff because of his Zionism but nonetheless participated in the 2026 LMBM despite Defendant being aware of this cyberbullying through prior litigation. *Id*. at ¶44.

**STANDARD OF REVIEW**

To survive a Rule 12(b)(6) motion, a complaint "does not need detailed factual allegations," but rather only factual allegations, which if held as true, are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations omitted). In other words, a complaint need only plead "enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [activity]." *Id.* at 556. The Supreme Court has advised that "[w]hen there are well-pleaded factual allegations, a court

should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). Courts must also draw "all inferences in the light most favorable to the non-moving party." *In re NYSE Specialists Sec. Litig*., 503 F.3d 89, 95 (2d Cir. 2007). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Therefore, when judicial experience and common sense indicate that the facts as pled and inferences as construed most favorably to the plaintiff suggest legal violations, a court must deny a related motion to dismiss.

## ARGUMENT

### I. Defendant Discriminated Against Plaintiff on the Basis of His Jewish Identity.

#### A. Zionism is a Core Component of Jewish Religion, Race, and National Origin or Otherwise a Proxy for it.

Defendant erroneously suggests that Plaintiff "improperly conflates Zionism with Judaism," Mem. at 12, but Plaintiff pleads in detail that Zionism is his sincerely held Jewish religious belief inseparable from his Jewish race and national origin. Compl. ¶¶13-18. "The Supreme Court has . . . cautioned against second-guessing the reasonableness of an individual's assertion that a requirement burdens her religious beliefs, emphasizing that a court's 'narrow function . . . in this context is to determine whether the line drawn reflects an honest conviction.'" *Bolden-Hardge v. Office of the Cal. State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023) (quoting *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 725 (2014)) (additional citation and quotations removed). The Second Circuit similarly advises that "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherents religious beliefs," and instead may only inquire into "whether religious beliefs are sincerely held," which is "largely a

matter of individual credibility." *Kravitz v. Purcell*, 87 F.4th 111, 127 (2d Cir. 2023) (citations and quotations removed). However, this is not the time for credibility determinations. As Defendant recognizes, here "a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor." Mem. at 4 (quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007)).

Courts have long recognized Jewish identity as overlapping and multifaceted rather than trifurcating the Jewish race, religion, and national origin into distinct silos. In *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987), the Supreme Court considered whether an attack on a synagogue—by definition centering on religion—sounded in the Civil Rights Act of 1866, only reaching race. The Supreme Court answered in the affirmative, noting "Jews . . . were among the peoples then considered to be distinct races and hence within the protection of the statute." *Id.* at 617-18.

"[C]ourts have regularly found that anti-Semitic harassment and discrimination," regardless of the specifics, "amount to racial discrimination," *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 354 (S.D.N.Y. 2014) (collecting cases), and treat Jewish identity holistically, especially as related to Israel. For example, in *Sinai v. New Eng. Tel. & Tel. Co.*, 3 F.3d 471, 474 (1st Cir. 1993), the First Circuit held as a proper jury question whether a company "discriminated against [an applicant] on the basis of his Hebrew/Jewish race by disparaging Israel." This largely turned on the relationship between the Jewish race and national origin and the court heeded the advice of Justice Brennan that for "race and national origin discrimination, often 'the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group.'" *Id*. (quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring)).

Further, even if not all Jews are Zionists, the prevalence of Zionism in Jewry is so great that discrimination against the former constitutes discrimination against the latter under the concept of proxy discrimination, the use of "seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Hecox v. Little*, 79 F.4th 1009, 1024-25 (9th Cir. 2023) (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013)). This is exactly what the First Circuit was getting at in *Sinai* by holding the targeting a nation state—and by implication related nationalism like Zionism—may be a proxy attack on an associated racial group.

The Supreme Court has alluded to proxy discrimination as applied to Jews, noting "[a] tax on wearing yarmulkes is a tax on Jews." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). Yarmulkes, however, are far less prevalent in American Jewry than Zionism. 82% of "U.S. Jews say caring about Israel is an important or essential part of what being Jewish means to them," 58% are "emotionally attached to Israel," and 32% believe "God gave the land that is now Israel to the Jewish people." In comparison only 17% keep kosher at home and "[o]n a typical day," 20% "wear something that is distinctively Jewish, such as a kippa (yarmulke)." Compl. at ¶17. As yarmulkes and keeping kosher are a proxy for Jews, all the more so for Zionism. Unsurprisingly, Meta, the parent company of Facebook, polices the derogatory use of the term "Zionist," effectively recognizing such use as an antisemitic smear. In commenting on Meta's policy, the Anti-Defamation League ("ADL") noted "since Oct. 7, many online and elsewhere, have increasingly used the term as a proxy for attacking Jews."[2]

---

[2]https://www.facebook.com/adlorg/posts/we-applaud-metas-decision-to-expand-its-hate-speech-policy-regarding-those-who-u/859213716253420/

### B. Defendant's Contrary Authority on Zionism is Inapposite and Otherwise Supports Plaintiff.

In arguing that Zionism is not a protected trait, Defendant looks to cases centering on whether anti-Zionist speech constitutes unlawful harassment, Mem. at 17-19, but this is a disparate treatment case. Defendant did not "merely criticize[] Israeli government policy or Zionist ideology," Mem. at 17 (quoting *Canel v. Art Inst. of Chi.*, No. 23CV 17064, 2025 U.S. Dist. LEXIS 30309, at *27 (N.D. Ill. Feb. 20, 2025)), but rather excluded Plaintiff from LMBM on the basis of his Zionism. None of Defendant's authority turns on what is actually relevant: (1) Plaintiff's dispositive pleading of Zionism as a sincerely held religious belief, interconnected with racial and national origin identities, mandating deference to Plaintiff at this stage, and (2) disparate treatment via exclusion on the basis of this Zionism. When such factors combine, courts find the ensuing discrimination outrageous. At UCLA, for example, Hamas apologists organized checkpoints and "people who supported the existence of the state of Israel were kept out" of portions of campus, including "Jewish students who assert[ed] they have a religious obligation to support the Jewish state of Israel." *Frankel v. Regents of the Univ. of Cal.*, 744 F. Supp. 3d 1015, 1021-22 (C.D. Cal. 2024) Pulling no punches, Judge Scarsi wrote:

> In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith. This fact is so unimaginable and so abhorrent . . . that it bears repeating, *Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith*.

*Id.* at 1020 (emphasis retained). Similar could be be said about Plaintiff's exclusion from LMBM. Defendant provides no contrary on-point authority.

In fact, Defendant's lead case, *Gartenberg*, illuminates how anti-Zionism may create a jury question on whether conduct is antisemitic. There, "a group of . . . students . . . allege[d] that

they suffered a hostile educational environment on the basis of their [Jewish] national origin." *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 253 (S.D.N.Y. Feb. 5, 2025). Contrary to Defendant's implication that *Gartenberg* found Zionists unprotected by civil rights law, the court "in no way doubt[ed] the sincerity of many Jews' religious, national, and ancestral connections to Zionism" but decided the "case can be resolved without opining on whether conduct or speech hostile to Zionism, itself a term subject to a considerable variety of interpretations, is necessarily antisemitic." *Id*. at 268. While refusing a per se ruling on Zionism, the court not only recognized Jewish "religious . . . connections to Zionism," which as noted here entitles Plaintiff to deference, but also suggested a jury question as it is subject to a "variety of interpretations."

The Second Circuit has held words and statements "reasonably susceptible of multiple meanings" are "for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine." *Electra v. 59 Murray Enters*., 987 F.3d 233, 259 (2d Cir. 2021) (quoting *Celle v. Filipino Reporter Enters*., 209 F.3d 163, 178 (2d Cir. 2000)). In *Abrams*, the Second Circuit held "the phrasing 'better fit' or 'fitting in' just might have been about race; and when construing the facts in a light most favorable to the non-moving party . . . could be enough to create a reasonable question of fact for a jury." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 253 (2d Cir. 2014). Here, Defendant's reference to Plaintiff's Zionism in calling him a "Zionist weasel" "just might have been about [Judaism]," entitling Plaintiff to the same result of *Abrams*.

Defendant's reliance on *StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech*., 158 F.4th 1 (1st Cir. 2025) is also misplaced, because there, as even quoted by Defendant, the court found "no consensus" on the relationship between anti-Zionism and antisemitism. Mem at 18 (quoting

*id*. at 16-17). Therefore, this case is highly problematic because, as noted by First Circuit Judge Dunlap:

> The panel acknowledges the existence of an "ongoing debate as to the relationship between anti-Zionism and antisemitism -- debate that our constitutional scheme resolves through discourse, not judicial fiat." *StandWithUs*, 158 F.4th at 17. But even as it makes this statement, the panel seems to impose just such a resolution[.]

*StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech*., 165 F.4th 97, 100 (1st Cir. 2026) (Dunlap, J. concurring). *StandWithUs* additionally violates the First Circuit's "fundamental principle that a newly constituted appellate panel cannot overrule a prior panel." *Guilfoile v. Shields*, 913 F.3d 178, 193 n.15 (1st Cir. 2019). In per se rejecting the "interpretive lens equating anti-Zionism . . . and antisemitism," Mem. at 18, the court ignored prior precedent established in *Sinai* discussed above, in which it held as a jury question whether a company "discriminated against [an applicant] on the basis of his Hebrew/Jewish race by disparaging Israel." 3 F.3d at 474.

Here, Defendant removing Plaintiff from LMBM while issuing offensive commentary on Plaintiff's Zionism immediately after Plaintiff explained his Zionism is not "a political philosophy" but rather "a component of Jewish identity" for him, Mem. at 18 (quoting *Landau v. Corp. of Haverford Coll*., 780 F. Supp. 3d 548, 555 (E.D. Pa. 2025)), creates questions only a jury can resolve.

### C. Defendant Directly Discriminated Against Plaintiff on the Basis of His Jewish Identity.

#### 1. Defendant Directly Discriminated Against Plaintiff by Acting on His Own Articulated Antisemitic Animus.

Far from "fail[ing] to allege that Defendant was ever aware that Plaintiff was Jewish," Mem. at 13, Plaintiff pleads in detail that Defendant, contemporaneous to removing Plaintiff

from LMBM, referred to Plaintiff using the antisemitic racial slur of "Zionist weasel," echoing notorious Third Reich propaganda holding Jews as vermin. Compl. at ¶¶28, 30. Defendant used this slur immediately after reviewing a message from Plaintiff describing his Jewish identity, *id.* at ¶30, and shortly after reviewing tweets containing indicia of Plaintiff's Judaism, including Plaintiffs' display of a large Israeli flag and his time spent in homogeneously Jewish enclaves in Israel-Palestine, settled as a matter of religious mandate. *Id.* at ¶¶20-21. Defendant's initial knowledge of Plaintiff's Judaism stemmed from reviewing Mendez's tweet, the only way he would have known to ultimately use the phrase "Zionist weasel," which contained copies of Plaintiff's tweets alluding to Plaintiff's Judaism. *Id.* at ¶¶27, 30. Defendant verified he reviewed Plaintiff's Jewish-oriented tweets *prior* to banning him. *Id.* at ¶37 (Defendant noting Plaintiff "made some outrageous posts that we'd autoban anybody for.").

Defendant characterizing Plaintiff's explanation of his Jewish identity as "Zionist," in calling Plaintiff a "Zionist weasel," clarifies that Defendant understood Zionism as an aspect of Jewish identity. If Defendant thought otherwise, it would not have made sense for him to characterize Plaintiff's Jewish-oriented message as "Zionist," and Plaintiff's message reflected his Zionist-Jewish identity no less than the tweets Defendant reviewed prior to removing Plaintiff. Ultimately, Defendant using an antisemitic slur based on what he understood as Plaintiff's Jewish identity constitutes direct evidence of discriminatory animus. As properly summarized in *Sumrall*, a prominent case described *infra* exploring antisemitism masquerading as anti-Zionism:

> "Direct evidence is "a smoking gun," *Amadeo v. Zant*, 486 U.S. 214, 226 (1988), "that itself shows racial or gender bias," *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013). One "statement alone [that] is direct evidence" is enough to send a case to trial. *Id.* at 576-77.

*Sumrall v. Ali*, 793 F. Supp. 3d 199, 208 (D.D.C. 2025). The Second Circuit takes an identical approach. *See, e.g.*, *Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 162-63 (2d Cir. 2001) (defining "direct evidence" as "statements of a person involved in the decisionmaking process that reflect a discriminatory . . . animus" and finding such evidence raises a jury question (quoting *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992))).

In pleading direct evidence, one need not allege the decisionmaker directly linked a protected characteristic to the challenged decision or even used a slur; a mere reference to the trait is adequate. In the D.C. Circuit's *Ayissi-Etoh*, cited in *Sumrall*, the decisionmaker's statement of "[f]or a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money" constituted direct evidence. *Ayissi-Etoh,* 712 F.3d at 575. The Second Circuit reasons similarly. In *Banks*, a retaliation case, the appellant's employer first denied her return from sick leave, "noting that [she] had filed [protected complaints]" and criticizing her "conflict resolution skills" and emotional reactivity, and later, in approving her return, noting that the investigations based on those complaints had terminated. *Banks v. GM*, LLC, 81 F.4th 242, 256 (2d Cir. 2023). Critically, the employer never directly said "we are denying your return *because* of your protected activity." All that mattered was the "explicit reference to the status of Banks's [protected] complaints and their correlation to [the employer's] approval decisions," which the Second Circuit held as "direct evidence sufficient to support a finding of retaliatory intent." *Id.* at 277. Here too, Defendant explicitly referred to Plaintiff's protected trait, and this reference was correlated with Defendant's decision to remove Plaintiff from LMBM.

Courts in this district have even held innuendo as direct evidence, such as telling a Jewish employee "[y]ou don't fit in" when read in the context of prior "derogatory comments about

Jewish individuals" and expressions of anger at an employee leaving "work early on Fridays to arrive home prior to sundown in accordance with Jewish religious tradition." *Kelly v. Metro-North C. R.R.*, No. 87 Civ. 5817 (JFK), 1989 U.S. Dist. LEXIS 15025, at *15 (S.D.N.Y. Dec. 18, 1989). Here too, Defendant targeted Plaintiff on the basis of "Jewish religious tradition," *id.*, specifically Zionism, as pled at length. Compl. at ¶¶13-19, 22-23.

Finally, courts not only look to prior and contemporaneous statements of bias as direct evidence, but also post-hoc commentary, including slurs. *See, e.g.*, *Hairston v. Royal Bldg. Prods.*, No. 1:18CV00003, 2019 U.S. Dist. LEXIS 62936, at *15 (W.D. Va. Apr. 12, 2019) (A decisionmaker's "statement [involving the n-word] . . . immediately after . . . termination qualifies as direct evidence that racial discrimination played a role in the termination."); *EEOC v. WRS Infrastructure & Env't, Inc.*, No. 09 C 4272, 2011 U.S. Dist. LEXIS 110149, at *23, 46-47 (N.D. Ill. Sep. 27, 2011) (same); *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 150 (2d Cir. 2024) (post hoc admission that plaintiff was terminated for being "on disability" constituted direct evidence).

Ultimately, "[d]irect evidence is that which 'demonstrates a specific link between a materially adverse action and the protected [trait], sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in [connection to] the protected [trait]." *Banks*, 81 F.4th at 277 (quoting *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 804 (8th Cir. 2019)). It does not get anymore direct than Defendant being presented with Plaintiff's idiosyncratically Jewish tweets, Plaintiff's explanation that he was targeted on the basis of his Jewish identity as reflected in his tweets, and Defendant's only response being to laugh at Plaintiff and call him an antisemitic slur, "Zionist weasel," directly linking Plaintiff's explanation of his Jewish identity to

Zionism. The contemporaneous and even after-the-fact use of a slur is quintessential direct evidence.

In challenging Plaintiff's pleading of direct evidence of discrimination, three distinct counterarguments emerge from Defendant's memorandum, all of which overburden Plaintiff at the pleading stage, only requiring that Plaintiff demonstrate plausibility. *Iqbal*, 556 U.S. at 664 (2009). As noted, Defendant first argues that Plaintiff fails to plead that Defendant knew Plaintiff was Jewish when he removed him from LMBM, Mem. at 13, but the above described sequence of events establish Defendant *plausibly* knew Plaintiff was Jewish. Throughout, Defendant understood a link between Plaintiff's Zionism, and expressions thereof, and Jewish identity. The indicia of Plaintiff's Judaism presented to Defendant far eclipses that in cases where antisemitism was established. In *Sumrall*, the only indicia of the plaintiff's Judaism was her wearing an Israeli flag as a cape. 793 F. Supp. 3d at 202. Judge McFadden correctly noted "[p]urposefully yanking on an Israeli flag tied around a Jewish person's neck to choke them is direct evidence of racial discrimination. The Star of David—emblazoned upon the Israeli flag—symbolizes the Jewish race." *Id*. at 209. This matter not only involves Plaintiff's display of an Israeli flag but other indicia of Judaism and the use of an antisemitic slur, whereas no words were exchanged in *Sumrall*, as emphasized by the defense in that case. 1:25-cv-02277-TNM, ECF No. 40-1, at 33 (D.D.C. Nov. 12, 2025). Importantly, *Sumrall* was decided on the merits in the form of a preliminary injunction. 793 F. Supp. 3d at 201. Here, Defendant's knowledge of Plaintiff's Judaism exceeds that in *Sumrall* and Plaintiff has a far lighter burden, mere plausibility. As Defendant's own authority notes, "a plaintiff must adduce *some* evidence, whether direct or *indirect*, indicating a defendant's knowledge as to the" plaintiff's protected characteristic, a "minimal" burden. *Woodman v. WWOR-TV, Inc*., 411 F.3d 69, 83 (2d Cir. 2005)

(emphasis added); *see also* Mem. at 13 (citing *id.*). While Defendant cites countless cases demonstrating that one cannot discriminate against someone on the basis of a characteristic of which the decisionmaker has no knowledge, Mem. 13-14, this is not such a case.

Defendant also challenges the link between Zionism and Judaism, as noted at length above, but Defendant asks too much of this Court too soon by requesting a finding of fact on this relationship that only a jury can determine. Against his own authority, Defendant asks this Court to rule by judicial fiat that Zionism is political, despite the fact that Defendant clearly understood otherwise by characterizing Plaintiff's recitation of his Jewish identity as "Zionist" and then connecting this characterization to vermin to use as a slur. "At the pleading stage, plaintiffs need only provide 'plausible support [for] a minimal inference of discriminatory motivation.'" *Kopmar v. Ass'n of Legal Aid Attys.*, No. 24-CV-5158 (JPO), 2025 U.S. Dist. LEXIS 134446, at *13 n.2 (S.D.N.Y. July 15, 2025) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). The way in which Defendant used the term "Zionist" satisfies this burden.

Finally, Defendant challenges Plaintiff's showing of direct evidence by arguing he had "a non-discriminatory basis for [Plaintiff] being barred." Mem. at 13. Specifically, he looks to some of Plaintiff's tweets and Mendez's feigned concerns of safety, ignoring the part where Mendez referred to Plaintiff as a "Zionist weasel." Mem. at 14-15. Yet, in discussing Mendez's request with his colleagues, Defendant's only real-time assessment was to echo Mendez's racial slur rather than indicate any umbrage with the appropriateness of Plaintiff's tweets or validate these purported non-discriminatory reasons. *See* Compl. Ex. 3. Given Plaintiff's direct evidence, this is not case "where the plaintiff acknowledges a non-discriminatory reason for an adverse action, without any alleged facts that this reason was pretextual," warranting dismissal at the pleading stage. Mem. at 15. To the contrary, Plaintiff's evidence is so strong and rare that it effectively

grants Plaintiff a jury. *See Sumrall*, 793 F. Supp. 3d at 207 ("Direct evidence is 'hard to come by' so 'its presence generally entitles a plaintiff to a jury trial'" (quoting *Moini v. Wrighton*, 602 F. Supp. 3d 162, 172 (D.D.C. 2022))).

As Plaintiff pleads the type of evidence that sends a case to a jury, it obviously follows he must succeed at all steps along the way, including surviving a motion to dismiss. This is all the more true here as Plaintiff has furnished a verified complaint, and given that Defendant does not and cannot dispute the testimony that he called Plaintiff a "Zionist weasel," this will ultimately became an undisputed material fact in favor of Plaintiff. Defendant will have ample opportunity to present his theory of Zionism and purported non-discriminatory reasons for removing Plaintiff to a jury.

**2. Defendant Directly Discriminated Against Plaintiff by Deferring to the Antisemitic Animus of Others.**

As Defendant correctly recognizes, "Plaintiff's Complaint acknowledges that the LMBM TOs received numerous 'community demands to ban Plaintiff,'" Mem. at 16 (quoting Compl. at ¶35), but Defendant can find no refuge in attempting to argue that his real motive in removing Plaintiff from LMBM were community complaints over Plaintiff's participation rather than any personal animus to Plaintiff's Jewish identity. These community complaints began with and were derivative of Mendez's racist targeting of Plaintiff for being a "Zionist weasel," Compl. at ¶¶27, 35, and therefore cannot be a legitimate ground for banning Plaintiff.

Under the Supreme Court's binding *Bostock* precedent on causation in discrimination claims, Plaintiff's Zionism, his sincerely held religious belief and signifier of his Jewish and national origin identity, "play[ed] a necessary and undisguisable role in the decision" to remove Plaintiff from LMBM. *Bostock v. Clayton Cty.*, 590 U.S. 644, 652 (2020), satisfying the strictest standard of causality: but-for causation. "In other words, a but-for test directs us to change one

thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id*. at 656. Absent Plaintiff's Zionism, and his ensuing expressions and professions of such, there would have been no community complaints and he would have participated in the 2024 LMBM.

Under *Bostock*, a discrimination claim "defendant cannot avoid liability just by citing some other factor that contributed to its challenged [adverse] decision. So long as the plaintiff's [protected trait] was one but-for cause of that decision, that is enough to trigger the law." 590 U.S. at 656. Here, the community complaints are an irrelevant "other factor," as made clear by a line of cases predating and buttressing *Bostock*. For example, in *Adickes v. S. H. Kress & Co*., 398 U.S. 144 (1970), a restaurant refused to serve a white teacher because she was accompanied by black students. *Id*. at 146-147. The restaurant argued at length she "was refused service only because [it] was fearful of a riot in the store by customers angered at seeing a 'mixed group' of whites and blacks eating together." *Id*. at 153-54. Such fears were well-founded as a large and displeased crowd had gathered. *Id*. at 154 n.10. Nonetheless, the Supreme Court noted "[i]t is clear . . . that [the] refusal to serve petitioner was a violation of [Title II] of the 1964 Act." *Id*. at 150 n.5. Similarly, in *Katzenbach v. McClung*, 379 U.S. 294, 295 (1964), the Supreme Court reversed an injunction blocking Title II enforcement over a restaurant's objection "that if it were required to serve Negroes it would lose a substantial amount of business." *Id*. at 297. In issuing the overturned injunction, the lower court found "title II will cause substantial and irreparable injury to their business." *McClung v. Katzenbach*, 233 F. Supp. 815, 819 (N.D. Ala. 1964). This was of no concern to the Supreme Court. *Adickes* clarifies that even a prospectively violent community reaction does not absolve an establishment of adhering to anti-discrimination law, and all the more so for a real and imminent loss of patronage per *McClung*.

Courts in this Circuit have ruled similarly. *See, e.g, Feder v. Bristol-Myers Squibb Co.*, 33 F. Supp. 2d 319, 333 n.114 (S.D.N.Y. 1999) (collecting cases and noting "[t]he weight of authority is that customer antipathy to members of protected groups does not make membership in a more favored group a bona fide occupational qualification."); *Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762, 769 (S.D.N.Y. 2002) ("While pandering to customers' discriminatory preferences could very well help effectuate a sale, employers nevertheless 'may not discriminate on the basis of their customers' preferences.'" (quoting *Wigginess Inc. v. Fruchtman*, 482 F. Supp. 681, 692 (S.D.N.Y. 1979), *aff'd without opinion*, 628 F.2d 1346 (1980))); *Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 365 (S.D.N.Y. 2007) (same). Therefore, community complaints over Plaintiff's Zionism was not proper grounds to ban him, and Defendant's admission of being motivated by such complaints also constitutes direct evidence of discrimination.

### D. Defendant Indirectly Discriminated Against Plaintiff on the Basis of His Jewish Identity.

Even absent Plaintiff's dispositive showing of direct evidence, Plaintiff pleads adequate indirect evidence of discriminatory animus. "[F]or a discrimination claim to survive a motion to dismiss, absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff (1) is a member of a protected class, (2) was qualified, (3) suffered an adverse . . . action, and (4) has at least minimal support for the proposition that the [decisionmaker] was motivated by discriminatory intent." *Tenemille v. Town of Ramapo*, No. 22-1715, 2025 U.S. App. LEXIS 23731, at *4 (2d Cir. Sep. 15, 2025) (quoting *Buon v. Spindler*, 65 F.4th 64, 78 (2d Cir. 2023)). Defendant does not dispute the first three prongs but, as discussed to at length above, disputes the last. Plaintiff satisfies this prong with comparator evidence. "A showing of disparate treatment -- that is, a showing that the [decisionmaker] treated plaintiff 'less favorably than a similarly situated [individuals] outside his

protected group' -- is a recognized method of raising an inference of discrimination." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

Even accepting Defendant's post hoc justification for banning Plaintiff on grounds that he "made some outrageous posts," Compl. at ¶37, Plaintiff must survive Defendant's motion because Plaintiff pleads Defendant was aware of at least two non-Jewish individuals who engaged in far more egregious conduct, cyberbullying Plaintiff based on his Jewish identity, but Defendant never removed them from LMBM. Mendez called Plaintiff an antisemitic slur reminiscent of Nazi propaganda, organizing a cancellation campaign against Plaintiff in the process, and Farraj falsely accused Plaintiff of supporting genocide and joined the mob responding to and amplifying Mendez's "Zionist weasel" post. ¶¶27-28, 41, 44.

## II. Plaintiff States Claims for All Causes of Action.

### A. Plaintiff has Standing and States a Claim under Title II of the Civil Rights Act of 1964.

Defendant correctly recites the elements of Plaintiff's Title II claim under the Civil Rights Act of 1964, 42 U.S.C. § 2000a, specifically allegations "(1) that he was deprived of equal use and enjoyment of a place of public accommodation and (2) facts which demonstrate discriminatory intent." Mem. at 11-12 (citing *Coward v. Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 307 (S.D.N.Y. 2009)). Defendant does not dispute the denial of public accommodations element, and his arguments related to discriminatory intent are refuted above in Section I. As Title II relief is limited to equitable relief, including injunctive and declaratory relief, as well as associated costs and attorney's fees, 42 U.S.C. § 2000a-3(a); *Bellamy v. House*, 2025 U.S. Dist. LEXIS 62200, at *2-3 (D.S.C. Apr. 1, 2025), Defendant challenges Plaintiff's standing,

questioning whether Plaintiff pleads a "real and immediate threat of repeated injury." Mem. at 20 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

Courts in this circuit have held that pleading a single instance of discrimination sets the stage for injunctive relief, and by implication an expectation of repeated injury. *Thomas v. Tops Friendly Markets*, Civil Action No. 96-CV-1579 (RSP/GJD), 1997 U.S. Dist. LEXIS 15887 (N.D.N.Y. Oct. 8, 1997). *Thomas* centered on allegations that grocery store employees restrained and searched a black customer on false pretenses of theft. *Id.* at *2-3. The grocery store argued that "allegations of a single instance of discrimination . . . will not support injunctive relief." *Id.* at *15. The court disagreed, as the plain text of "section 2000a-3 provides that 'whenever any person has engaged . . . in any act or practice prohibited by section 2000a-2 . . . , a civil action for preventive relief, including an application for a permanent or temporary injunction . . . may be instituted by the person aggrieved.'" *Id.* (citing 42 U.S.C. § 2000a-3(a)). Rather than requiring continuous discrimination, "[i]n order to seek injunctive relief, it is sufficient that one person engaged in discrimination." *Id.* at *15-16. Critically, the court indicated no evidence of an explicit intent of the grocery store to discriminate again, implying a single act of discrimination portends future discrimination and otherwise entitles a plaintiff to discovery on this issue. The court denied the grocery store's motion to dismiss. *Id.* at *17.

*Sumrall* also involved a single instance of discrimination, specifically a brief battery motivated by antisemitism. The court relied on the premise that "being subjected to discrimination is by itself an irreparable harm." 793 F. Supp. 3d at 210 (quoting *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016) (citing *Smith v. City of Jackson*, 544 U.S. 228, 249 (2005) (O'Connor, J., concurring)). "This is particularly so when there is 'future discriminatory conduct to be prevented.'" *Id.* (quoting *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 2019 U.S.

Dist. LEXIS 76459, 2019 WL 2010523, at *6 n.2 (D.D.C. May 7, 2019)). Defendant canceled Plaintiff's LMBM participation for being a Zionist, Plaintiff remains a Zionist, and Defendant has not altered his position that the law allows him to ban Plaintiff on such grounds.

*Frankel*, the UCLA encampment case, also looked to whether the plaintiffs faced "an imminent likelihood of future injury." 744 F. Supp. 3d at 1023. The court noted "'[i]t is well settled that evidence of past instances of enforcement is important in a standing inquiry'" and "'[c]ourts have also considered [a] failure to disavow' [unlawful] acts 'as a factor in favor of a finding of standing.'" *Id*. (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000)). Both principles apply here. Defendant discriminated against Plaintiff and believes he remains entitled to do so because it was political rather than antisemitic discrimination. Like in *Frankel*, "given the risk that" Defendant "will again restrict" Plaintiff's participation in LMBM, Plaintiff "[is] likely to suffer an irreparable injury." *Id*. at 1027.

These cases are broadly in line with the Supreme Courts admonition that "[i]f an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977). A clear corollary to this is that someone already subjected to a discriminatory rebuff need not subject himself to additional rebuffs before seeking judicial intervention.

This Court should follow the above cases. In arguing otherwise, Defendant looks to *James v. Am. Airlines, Inc*., 247 F. Supp. 3d 297 (E.D.N.Y. 2017), in which a black airline passenger had an altercation with white passenger and a "flight attendant admonished [her] and threatened to remove her from the plane if she continued cursing" but did not similarly admonish or threaten the purported aggressor. *Id*. at 299-300. In ruling the plaintiff failed to plead the

requisite likelihood of future injury entitling her to prospective relief, the court considered a number of factors, neatly encapsulated in Defendant's memorandum, Mem. at 20 (quoting *id*. at 306), not present here. While James centered on "a single act of discrimination," so too did *Thomas*, but *James* occurred "under specific circumstances involving an altercation [with] another passenger," whereas here Plaintiffs pleads the discrimination stemmed from Defendant learning about the Zionist aspect of his Jewish identity, to which Defendant objected given his use of a slur exhibiting generalized antisemitism, as well as community opposition to someone with such an identity. While James would almost certainly never again encounter and fight with the other passenger on another flight, which incited the alleged discrimination, here Plaintiff's Jewish identity and Defendant's knowledge of such are not going anywhere, nor will antisemitic community opposition to Plaintiff's presence at LMBM, and there is no evidence Defendant has changed his views. Similarly, James did not "allege any facts suggesting that she plans to take another American flight in the near future, let alone that she is likely to take a flight staffed by the same pilot and crew whom she accuses of acting against her," whereas here Plaintiff has plead an indefinite intention to patronize the annual LMBM, where Defendant remains the head TO. Finally, as Plaintiff's claims are against the individual who discriminated against him, rather than LMBM, and the specific circumstances leading to the discrimination remain present, the failure of James to plead "a policy, practice, or pattern of discrimination" on the part of the airline itself is impertinent here.

Defendant also cannot avoid Title II liability on grounds that he previously "agreed to a stipulated preliminary injunction prohibiting Defendant from banning Plaintiff," Mem. at 21, as this offer, instead of focusing on the narrow grounds of ensuring a halt to future discriminatory LMBM bans, amounted to a "get out of jail free" card, blocking Defendant from removing

Plaintiff on *any* grounds, even misconduct, which Plaintiff reasonably anticipates would only compound the extreme bullying he receives from the LMBM community for seeking to vindicate his civil rights. Compl., ¶66. Plaintiff does not want special treatment from Defendant or a reputation for extracting such, and he otherwise respects Defendant's right confront and punish misconduct. *Id*. Defendant should not be permitted to victimize Plaintiff and then dictate resolution leading to further victimization via community bullying.

It is also of no consequence that "the 2026 Tournament that Plaintiff so feared has concluded without incident, and Defendant agrees to permit Plaintiff to participate in any future events." Mem. at 21. Preliminarily, both the outcome of the 2026 LMBM and Defendant's purported agreement to not ban Plaintiff from future events—the latter presumably on the same unwanted "get out of jail free" terms as Defendant's prior proposed stipulated preliminary injunction—are well outside of the pleadings. To the extent the Court weighs these items, it should consider that Defendant permitted Plaintiff's participation with the ongoing threat of this litigation hanging over his head. Finding Plaintiff's Title II claim moot and granting Defendant's request for "dismissal with prejudice," Mem. at 21, eliminates this deterrent. Moreover, the Supreme Court has made clear under the voluntary cessation doctrine that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[the] defendant . . . free to return to his old ways.'" *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 n.10 (1982) (quoting *United States v. W. T. Grant Co*., 345 U.S. 629, 632 (1953)). In such instances, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 190 (2000). Defendant cannot make this

showing for the simple reason that he continues to believe as repeated throughout his brief, that he is entitled to discriminate against Plaintiff on the basis of his Zionism, which Defendant mischaracterizes as permissible political discrimination.

### B. Plaintiff States Claims under The Civil Rights Act of 1866.

Defendant accurately recites the elements of a claim under 42 U.S.C. § 1981 and § 1982, specifically "(1) the plaintiff is a member of a racial [or ethnic] minority, (2) an intent to discriminate on the basis of race [or ethnicity] by the defendant, and (3) the discrimination concerned one or more of the activities enumerated in the statute." Mem. at 21-22 (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec.*, 7 F.3d 1085, 1087 (2d Cir. 1993)). Defendant only challenges the second element and on the same grounds Plaintiff addressed above in explaining his direct evidence of discrimination. Specifically, Defendant challenges whether Plaintiff has pled Defendant intentionally discriminated against Plaintiff on the basis of racial animus and whether these pleadings overcome explanations alternative to discrimination. Mem. at 21-23. Plaintiff herein incorporates by reference his arguments in Section I addressing Defendant's arguments as applied to the Civil Rights Act of 1866.

### C. Plaintiff States Claims under The Civil Rights Act of 1871 and Common Law Tortious Interference.

Defendant correctly recites the elements of a 42 U.S.C. § 1985(3) claim but incorrectly argues that because "Plaintiff does not allege any facts to suggest that the objective of the . . . so-called conspiracy was to cast him into involuntary servitude or to obstruct his interstate travel," he cannot state a claim. Defendant misreads *Bray*, which merely acknowledged that of the limited number of § 1985(3) cases and corresponding purported rights actually presented to the Supreme Court, it found only rights related to these instances protected under § 1985(3). 506 U.S. at 278. Nothing in *Bray* forecloses other federal rights never considered by the court, and

those at issue here, particularly Plaintiff's right to contract free of racial discrimination under § 1981, is precisely in the proper wheelhouse because it is "in the . . . Thirteenth Amendment context." *Id*. As acknowledged by the Second Circuit, "§ 1985(3) applies in case[s] of . . . conspiracy to deprive persons of their rights under the thirteenth amendment." *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 587 (2d Cir. 1988) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 96 (1971)). In its original form, § 1981 "was passed under Congress' Thirteenth Amendment power to identify and legislate against the badges and incidents of slavery." *Patterson v. McLean Credit Union*, 491 U.S. 164, 197 (1989) (Brennan, J. dissenting). Therefore, even limiting § 1985(3) to violations in the scope of the Thirteenth Amendment, § 1981 is precisely the kind of federal law § 1985(3) reaches because "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Griffin*, 403 U.S. at 105 (quoting *Jones v. Alfred H. Mayer Co*., 392 U.S. 409, 440 (1968)). Beyond Plaintiff's right to contract, the Tenth Circuit has held "racially motivated interference with one's right to enjoy places of public accommodation constitutes such a badge of slavery" and related conspiracies are covered under § 1985(3). *Fisher v. Shamburg*, 624 F.2d 156, 159 (10th Cir. 1980). Plaintiff therefore pleads Defendant conspired to deprive him of multiple rights traceable to the Thirteenth Amendment and therefore remediable under § 1985(3). Plaintiff did not plead "conclusory, vague, or general allegations of a conspiracy to deprive [him of these] rights." Mem. at 24 (quoting *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977). Rather, he included the discussion in which the TOs' minds met for these deprivations, with all expressing antisemitic animus or deference to the antisemitic cancellation campaign. Compl. Ex. 3

Defendant also looks to the intracorporate conspiracy doctrine, Mem. at 24-25, holding "that there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (citing *Girard v. 94th and Fifth Avenue Corp.*, 530 F.2d 66 (2d Cir. 1976)). Even if Defendant is correct this doctrine extends to agents in general, Mem. at 25, as the Complaint does not plead an employment relationship, the Second Circuit has held when a "plaintiff can show that [the defendant] and the other employees conspired with each other on the basis of personal animus, and not out of any desire to serve the interests of the [employer], then the intra-enterprise doctrine would not apply." *De Litta v. Village of Mamaroneck*, 166 F.App'x 497, 499 (2d Cir. 2005). The presence of personal animus alone is dispositive to survive dismissal, and therefore, like in *De Litta*, "[a]t this stage of the litigation, dismissal [is] inappropriate because 'it is not clear that the plaintiff could prove no set of facts supporting the notion that [Defendant] acted upon some personal motive.'" *Id*. at 498 (quoting *Roniger v. McCall*, 22 F. Supp. 2d 156, 169 (S.D.N.Y. 1998)). Plaintiff has pled in detail that Defendant acted on the basis of antisemitic "personal animus."

The Second Circuit has further clarified "that where various entities in a single institution have 'disparate responsibilities and functions,' a conspiracy claim could lie because the actions of those entities would not be 'actions of only one policymaking body.'" *Turkmen v. Hasty*, 789 F.3d 218, 263 (2d Cir. 2015) *rev'd on other grounds in Ziglar v. Abbasi*, 582 U.S. 120, 152-55 (2017) (quoting *Girard*, 530 F.2d at 70-72). Defendant's correct characterization of LMBM owner's post hoc inquiries into Plaintiff's removal makes this point by showing the disconnect between LMBM's leadership and the TOs, acting without any top-down policy guidelines.

Defendant notes "that [LMBM's] owner contacted the LMBM TOs regarding Plaintiff's ban, asked for information regarding how the decision to ban Plaintiff was made, and asked the LMBM TOs to look for relevant codes of conduct for the tournament" after the fact. Mem. at 25 (citing Compl. at ¶¶35, 38-39). As the Complaint makes clear, the TOs acted on their own with LMBM's owner in the dark and necessitating his post hoc inquiries, Compl. ¶¶35-39, rather than according to a "policy implemented by" by corporate governance. *Girard*, 530 F.2d at 71. The Second Circuit found such disconnect dispositive in *Turkmen,* emphasizing that the individual defendants "themselves established policies" and ultimately holding that "factual questions about how disparate or distinct [d]efendants' functions were, and how policy was created by the various [d]efendants, preclude us from deciding as a matter of law that Defendants resemble the single policymaking body of a corporation." 789 F.3d at 263. The same applies here.

The reasons underlying Defendant's inability to invoke the intracorporate conspiracy doctrine touch similarly on his arguments for dismissing Plaintiff's tortious interference claim. Defendant cites a rule that "a claim for tortious interference will lie only against a stranger" to a contract and "[a]n agent of one of the contracting parties is generally not a stranger to the contract." Mem. at 29 (citations omitted). However, there are exceptions to this rule. As the New York Court of Appeals has long held, this rule applies only to one "acting in good faith as an officer" and who otherwise did not commit "independent torts or predatory acts directed at another." *Murtha v. Yonkers Child Care Ass'n*, 45 N.Y.2d 913, 915 (1978). Courts in this district have similarly noted an exception to this rule if the "defendant acted with malice." *Cohen v. Davis*, 926 F. Supp. 399, 403 (S.D.N.Y. 1996). Defendant removing Plaintiff on grounds that he opposed an aspect of his Jewish identity, and even referred to it using a slur, was not an act in good faith but rather malicious and discriminatory. At least one local New York Court has ruled

similarly, noting "unlawful discrimination is sufficiently culpable to support a claim of interference with prospective economic relations. Certainly, it is morally reprehensible and unlawful to discriminate based upon national origin." *30 CPS, LLC v. Bd. of Managers of Cent. Park S. Med. Condo*., 23 Misc. 3d 1024, 1032 (Sup. Ct. 2009). *30 CPS*, like this matter, also involved "remarks evidencing animus toward . . . national origin." *Id*. Dismissal of Plaintiff's tortious interference claim on the grounds Defendant requests is therefore unwarranted.

### D. Plaintiff States Claims under all State and Local Statutory Causes of Action.

Defendant correctly notes "claims pursuant to NYCRL § 40, NYSHRL § 296, and NYCHRL § 8-107(4)," and by implication § 41, which solidifies a private right of action for not only direct violations of § 40 and § 40-c but also aiding and abetting, "are analyzed identically to their section 1981 claims." Mem. at 26 (quoting *Henry v. Lucky Strike Entm't*, LLC, No. 10-CV-03682 (RRM) (MDG), 2013 U.S. Dist. LEXIS 124939, at *41-42 (E.D.N.Y. Sep. 1, 2013)). As Plaintiff states a claim for § 1981, he equally states claims for these causes of action. Defendant also correctly notes "Section 41 requires that '[a]t or before the commencement of any action under this section, notice thereof shall be served upon the attorney general.'" *Id.*, at 27 (quoting N.Y. Civil Rights Law § 41). Defendant incorrectly notes, however, that "Plaintiff has not alleged and cannot allege that he complied with this requirement." *Id*. To the contrary, Plaintiff unequivocally alleges "[i]mmediately prior to filing this action, a copy of this Complaint was served on the New York Attorney General," therefore satisfying the notice requirement. Compl., ¶4.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant's motion in full.

Date: April 10, 2026

Respectfully submitted,

National Jewish Advocacy Center, Inc.

/s/ *Matthew Mainen*
Matthew Mainen
Maryland Bar No. 2012170265
Practicing *Pro Hac Vice*
Email: matt@njaclaw.org

**CERTIFICATE OF COMPLIANCE**

This brief is compliant with Local Rule 7.1(c) as it contains 8,742 words, excluding portions exempted by this rule.

Date: April 10, 2026

/s/ *Matthew Mainen*